Filed 6/21/16  P. v. Brown CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>VATILI JOSEPH BROWN,<br><br>        Defendant and Appellant. | A145007<br><br>(Sonoma County<br>Super. Ct. No. SCR 611489) |

Defendant and appellant Vatili Joseph Brown contends the trial court committed prejudicial error when, after revoking his probation, the trial court sentenced him to a seven-year prison term on the underlying offenses without first ordering and considering a supplemental probation report.  We conclude that the trial erred but find the error to be harmless considering the facts of the instant case.  Accordingly, we affirm the judgment.

## I. BACKGROUND

By information filed on March 7, 2012, the Sonoma County District Attorney charged defendant with possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), bringing a controlled substance into jail (Pen. Code, § 4573), obstructing a police officer (Pen. Code, § 148, subd. (a)(1)), driving with a suspended license (Veh. Code, § 14601.1, subd. (a)), and possessing drug paraphernalia (Health & Saf. Code, § 11364, subd.(a)).  The information further alleged that defendant committed the first

1

two offenses while on bail (Pen. Code, § 12022.1), that he had a prior conviction (Veh. Code, § 14601.1), suffered a prior strike for assaulting a peace officer (Pen. Code, §§ 245, subd. (c), 1170.12), and had served a prior prison term (Pen. Code, §§ 245, 667.6. subd. (b)).

On May 8, 2012, defendant appeared with counsel and pleaded no contest to all charges and admitted the special allegations. Thereafter, the trial court set the matter for sentencing and ordered preparation of a probation report.

The probation report was prepared for the sentencing hearing on June 5, 2012. In that report, the probation department noted that defendant "has an extensive history of criminal conduct, most of which was drug-related, but included a felony assault of a bailiff in Court." In addition to describing the present offenses, the probation report enumerated defendant's lengthy juvenile record, as well nine prior convictions he had suffered as an adult. The probation report further noted that, "With the exception of the defendant's success during a grant of state parole, and the fact he secured bedspace [*sic*] at the Delancey Street Foundation and at the Jericho Project, little positive can be said regarding him." The report also noted defendant's frequent failures on probation and his absolute and presumptive ineligibility for probation in light of his strike admission, explaining as follows: "All grants of formal probation resulted in sustained violations/new convictions during their courses, and/or unsuccessful termination."

Regarding sentencing, the probation report recommended that defendant be sentenced to a term of 13 years 8 months and noted that if defendant "truly desire[d] to participate in residential substance abuse treatment," he could do so while on parole.

The trial court, however, did not follow the probation department's recommendation. Instead, it granted defendant's motion to strike the strike, recognizing that he was a drug addict who had never received residential treatment. At the June 5, 2012 sentencing hearing, the district attorney asked that the court "[p]ut the hammer over his head . . . and let him know that the Court means business here," so that defendant would have the opportunity for treatment, "but with his eyes wide open knowing that if he screws up, if he walks away from the program, there are consequences and it's going

to be prison." Defense counsel added: "[Defendant] is someone that actually does agree with the [district attorney] . . . He's going to try to be done with [his addiction], and he knows he needs consequences. [¶] He wants to go to Delancey Street. He wants a significant sentence . . . to have that hanging over him to make sure he stays on the straight and narrow."

Prior to the June 5, 2012 sentencing hearing, defendant had written a letter to the court, advising that he had been accepted to three drug treatment programs, TASC, the Jericho Project, and Delancey Street. Of the three programs, defendant was "confident that Delancey Street would be the best for" him. At the hearing, defendant concurred in his attorney's statement, telling the court, "I agree with everything the [district attorney] was saying as far as holding the hammer over my head." Defendant recognized he needed to "change not only for myself but for my kids."

The trial court acknowledged that defendant's "past history has been awful. Just simply awful." At 28 years old, defendant had an "incredible" number of offenses, with his most recent offense requiring "a lot of deputies" to arrest him and the use of a Taser. The court told defendant that he had to "make a choice to stop" and that Delancey Street—a "hard" and "long" program—was a choice. The court also told defendant that he would have to waive credits while in the program, which was close to two years, and "understand[] at the end of it you'll either succeed and be a productive member of society and a father, or you'll end up going to prison under the sentence that I'm going to impose."

After pronouncing sentence, the court stated that it had changed its mind and asked defendant also to waive prior credits, "so what you're doing is really making a decision yourself that you're going to subject yourself to a full seven years of prison should you leave, quit, not complete that program." When the court asked whether defendant was "willing to do that," defendant apparently immediately agreed because the court asked, "You need to talk to your counsel about that at all?" Defendant said, "No, I understand fully."

The court reemphasized the choice defendant had: "You will complete the Delancey Street program. You may not leave it until you've successfully completed it. You will not leave unless you've had the prior written consent of the program director and the probation officer. Please don't leave that program. As soon as you make that choice that you don't like something, it's the wrong program for you, as soon as you leave it, you've just sent yourself to prison. Do you understand that?" Defendant again affirmed his understanding.

Defendant entered Delancey Street on June 27, 2012. Approximately six weeks later, he left the program on August 10, 2012.

On September 11, 2012, the probation department filed a petition to revoke defendant's probation. The petition alleged that defendant was found in possession of drug paraphernalia and that he left Delancey Street and failed to contact the probation department. Defendant waived his right to a hearing and admitted that he was in violation of probation. Defendant told the probation officer that his criminality was related to substance abuse and that he wanted to address his addiction, "pursue a relationship with his four young children," and take care of his mother. Probation was revoked and the matter was continued to November 20, 2012 for sentencing.

In a supplemental probation report dated November 14, 2012, the probation department remarked that defendant had "been a fixture in the criminal justice system since 1998" and that "his crimes have had significant impact on the community." The report noted that defendant had been given numerous opportunities to address his criminality while subject to various probation grants. However, "[i]nstead of embracing these opportunities, he chose to continue on a path of criminality." The probation department was concerned that if defendant were to fail in another treatment program, he "likely would abscond and the community would once again become susceptible to the criminality of someone with nothing to lose." This "dilemma" caused the department to "struggle[]" with its recommendation, but the department made "the highly generous and unusual recommendation" that defendant be "given this one last opportunity at formal probation," conditioned on waiving all custody credits and serving six months in jail.

The report concluded that defendant "should be clear that any future failures to abide by the conditions of his release will result in a prison recommendation."

On November 20, 2012, the trial court held a hearing. The court found itself "in an awkward position. Because the [district attorney] argued last time extensively for prison as did the Probation Department. I struck the strike, gave him an opportunity, and basically I spent about a page trying to explain to the [district attorney] why I was going to give, and [defendant], why I was going to give him one chance at probation after 14 convictions after his last strike, which was just a few years ago. I said if you leave Delancey you are going to prison. Now I'm in the awkward position of having probation reverse themselves, having the [district attorney] reverse themselves, and being faced with how do I have any credibility with all the other people in the box when I sentence them. Because it was an extraordinary gift to ignore those 14 convictions with a recent violent strike. Everything being equal, I should probably not have stricken the strike and he should have gone directly to prison. I really saw a hope and a pleading by [then defense counsel] and [defendant] that now is the time he was going to give a break from the criminal past that was extraordinary. Am I faced with the am I the only one [*sic*] that wants to protect the community here[?] I gave him a shot, gave him Delancey Street, it was a gift, and he absconded."

Defendant asked for a "second chance" because the program that was being considered took a different approach, and he would "take full advantage of the opportunity." The probation officer expressed "major concerns" about defendant's not having complied with the Delancey Street program but was "kind of falling back on the position of TASC that he would likely benefit from Turning Point."

The court reinstated and modified probation to include a six-month jail term and release for placement in a residential treatment program. The court expressed its hope that defendant did not "misinterpret this at all." The court also advised defendant that he would "not get a third chance. You need to do it this time." The court also obtained a waiver of credits and warned defendant that "if you were to fail in the future, it would be as if you hadn't spent any of this time in custody when we come back for resentencing."

5

On September 27, 2013, the trial court summarily revoked probation and issued a bench warrant based on allegations that defendant had used a controlled substance and had absconded from probation supervision. It was alleged that defendant had tested positive for methamphetamine, thereafter repeatedly failed to appear for testing, submitted diluted tests, and failed to appear for a TASC appointment, and, after TASC closed his case as unsuccessful, failed to contact the probation department and failed to respond to messages from his probation officer.

On March 19, 2015, the probation department filed a third request for revocation. It asserted that defendant had failed to obey all laws because he "fled from a traffic stop and was apprehended 'hiding' approximately 30 minutes later." The request stated, "This is the third violation in this matter. The defendant has been in warrant status since 09/26/13. Should he admit the violation, we respectfully recommend the suspended prison sentence be imposed."

In a letter that appears to be associated with this revocation request, defendant asked the court to consider granting him "one last chance at probation." He admitted violating probation twice since 2012, but stated that he would take full advantage of "this one last opportunity" and would be "a productive member of society [and] father to [his] newborn daughter."

At the April 13, 2015 hearing, the district attorney agreed with the probation department's recommendation that the sentence be executed. On April 16, 2015, defendant pleaded no contest to the new misdemeanor, and the court found him in violation of probation.

At the April 23, 2015 disposition hearing, the trial court stated it had gone "over just about all the material from the very beginning, original sentencing report, letters from Jericho and Delancey Street, defendant's letters," "the original sentencing transcript," and "alleged violations of probation . . . ." The district attorney asked that the sentence be executed, noting that defendant had been through "the most intense programs" but had multiple probation violations. The probation officer noted the probation department's "concern of not only failing to complete treatment at [two

6

programs], but significant periods of absconding after not completing those programs. . . . We don't feel he's amenable to continued Probation supervision." The officer "submit[ted] on the recommendation and most recent universal [*sic*] that the suspended prison sentence . . . be imposed."

Defense counsel informed the court that defendant had been accepted into a residential treatment program and was "interested in doing that at this point." Counsel explained that defendant had completed a residential treatment program but had fallen "short on the aftercare portion." Defendant addressed the court and stated his desire for "another opportunity" to address his addiction and asserted he was "willing to do whatever it takes at this point."

The trial court noted that "[w]hat's striking throughout this entire history is that you fight the police . . . [and] even at gunpoint, you flee. [¶] This recent violation, you were hiding and fleeing. [¶] . . . [¶] There's more than once where the Court was so clear to you that, and I'm referring specifically to DeLancey [*sic*] Street, if you decide it's not the right program for you, or you don't like the program and you leave, then you're going right to prison. [¶] Nevertheless, the Court gave you another opportunity at Turning Point and warned you, again on the record, one more violation, you're going to prison. [¶] And yet, [you] still can't seem to comply. I don't know what it is that you don't have an ability to be law abiding. . . . [¶] And based on your willingness to fight, flee, resist law enforcement and authority, I can only determine that you have an impulse control issue that makes you a danger, not only to law enforcement, but to the community at large. [¶] I'm going to go ahead an execute the previously imposed prison sentence . . . [¶]. . . I'm just reaffirming that the Court . . . believes we have tried every. . . resource that we have, and you're not amenable to probation."

## II. DISCUSSION

Defendant contends the trial court erred in failing to order and review a supplemental probation report before sentencing him at the probation revocation hearing. We agree.

7

The trial court must order a probation report when a person is convicted of a felony and eligible for probation.  (See Pen Code, § 1203, subd. (b)(1).)  Consistent with section 1203, a probation report was prepared in this case in connection with the original sentencing hearing held  June 5, 2012.  Further, "[s]tatutory authority and the California Rules of Court specify the circumstances under which the trial court must prepare a supplemental or updated report."  (*People v. Dobbins* (2005) 127 Cal.App.4th 176, 180 (*Dobbins* ).)  Specifically, Penal Code section 1203.2, subdivision (b),[1] requires "referral to the probation officer, preparation of a written report, and its consideration by the court upon a petition for revocation of probation."  (*Ibid.*)  However, the *Dobbins* court noted that "a supplemental or updated report is not necessarily needed in some cases where a recent report has been prepared that may be incorporated by reference.  Notably, California Rules of Court, rule 4.411(c) provides: 'The court *shall order* a supplemental probation officer's report in preparation for sentencing proceedings *that occur a significant period of time after the original report was prepared.*' "  (*Dobbins, supra,* 127 Cal.App.4th at p. 180, italics added.)

The *Dobbins* court then turned to the question of whether "the eight-month period of time between the original probation report and defendant's resentencing [was] a 'significant period of time' within the meaning of California Rules of Court, rule 4.411(c)."  *(Dobbins, supra*, 127 Cal.App.4th at p. 180.)  The court noted that the Advisory Committee Comment to California Rules of Court, rule 4 .411(c) "suggests that a period of more than six months may constitute a significant period of time, even if the defendant remains incarcerated and under the watchful eyes of correctional authorities."

---

[1]  Section 1203.2, subdivision (b)(1) provides in part: "[U]pon the petition of . . . district attorney, the court may modify, revoke, or terminate supervision of the person pursuant to this subdivision . . . The court shall refer . . . the petition to the probation or parole officer.  *After the receipt of a written report from the probation or parole officer, the court shall read and consider the report* and either its motion or the petition and may modify, revoke, or terminate the supervision of the supervised person upon the grounds set forth in subdivision (a) if the interests of justice so require."  (Italics added.)

(*Dobbins, supra,* 127 Cal.App.4th at p. 181.)  The court stated that the original probation report was prepared about eight months before the sentencing hearing at issue, "well in excess of the six months referred to by the Advisory Committee, and it included approximately two months when defendant was not under the watchful eyes of custodial authorities but was rather released on probation, when he committed the conduct for which his probation was revoked." (*Ibid.*)  Accordingly, the court held that "the trial court erred by proceeding without ordering a supplemental or updated report." (*Ibid.*)

In this case, the time lapse between the original probation report and defendant's resentencing was even greater than in *Dobbins.*  The original probation report was prepared for the sentencing hearing on June 5, 2012, and defendant was resentenced following the contested revocation hearing on April 23, 2015, nearly three years later. The first supplemental probation report from September 2012, was equally outdated. Moreover, defendant was not in custody during that entire period, but was released on probation most recently in late 2012 or early 2013 until sometime in or about March 2015, at which point he was arrested on the basis of the conduct for which his probation was revoked.  Accordingly, as in *Dobbins, supra,* we conclude the trial court erred by proceeding without ordering an additional supplemental probation report.[2] (See *Dobbins,*

---

[2]  The Attorney General contends the trial court did not err because 1) defendant waived a supplemental report by failing to request one or object to its omission prior to resentencing; 2) if not waived, the trial court was under no obligation to order a supplemental report because it was not *pronouncing* judgment, but rather *executing* the previously pronounced judgment; and 3) a "report" was  prepared.  We are not persuaded. First, the authority relied upon by the attorney general for his waiver argument, such as *People v. Oseguera* (1993) 20 Cal.App.4th 290 "fail[s] to consider the later enactment" of Penal Code section 1203, subdivision (b)(4), which provides that a probation report " 'may be waived only by a written stipulation of the prosecuting and defense attorneys . . . or an oral stipulation in open court . . . .' " (*Dobbins, supra,* 127 Cal.App.4th at p. 182, quoting section 1203, subd. (b)(4).)  Second, the authorities relied upon by the attorney general for the proposition that no supplemental report was required merely discuss the differences between pronouncement and execution of sentence.  (See *Stephens v. Toomey* (1959) 51 Cal.2d 864 [noting difference between pronouncing and imposing judgment]); *People v Banks* (1959) 53 Cal.2d 370, 384 [same]; *People v. Scott* (2014) 58 Cal.4th 1415, 1424 [same].)  Third, the "report" the attorney general refers to is not a

9

*supra,* 127 Cal.App.4th at p. 181.) The trial court's error, however, "implicates only California statutory law, [and] review is governed by the *Watson* harmless error standard." (*Id.* at p. 182; *People v. Watson* (1956) 46 Cal.2d 818, 836 [standard for harmless error analysis is whether the reviewing court "is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)

Here, defendant acknowledges that he had the benefit of an existing probation report, and that he had the same judge throughout the relevant proceedings. Nevertheless, he contends that the trial court's error was prejudicial, asserting that "there was potentially much to learn from a supplemental probation report."

Defendant's speculative assertions do not convince us that "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson, supra,* 46 Cal.2d at p. 836.) First, the judge who presided over the revocation hearing and who sentenced defendant "was [ ] intimately acquainted with the facts underlying his violation of probation," so a supplemental report was not necessary in that regard. (*Dobbins, supra,* 127 Cal.App.4th at p. 183.) Moreover, defendant merely speculates that a supplemental probation report might "well have uncovered facts and circumstances that would have persuaded the court to grant him another change on probation."

Both the original probation report, the first supplemental probation report, and defendant's letters apprised the trial court of defendant's background and other relevant information, about his family, including the birth of a child. Moreover, his record was such (including as it did numerous convictions and periods of incarceration, as well as multiple probation violations and revocations) that there was little justification for a further grant of probation.

---

supplemental probation report. Rather, it is the form filed to initiate the probation revocation proceedings.

In sum, in our opinion the record demonstrates that it is not reasonably probable the trial court would have imposed less than the aggravated term absent its error in failing to order a supplemental probation report.  (See *People v. Watson, supra,* 46 Cal.2d at p. 836.)

### III. DISPOSITION

The judgment is affirmed.


_____
Reardon, J.


We concur:


_____
Ruvolo, P.J.


_____
Streeter, J.